LEILA H. B. KISSAM, Appellant, *v.* GRANT SQUIRES, Respondent.

*Attorney and client — transactions between persons standing in confidential relations will be scrutinized with extreme vigilance — what is essential to a valid confirmation thereof.*

Where persons standing in a confidential relation make bargains with or receive benefits from the persons for whom they are counsel, attorney, agent or trustee, the transaction is scrutinized with extreme vigilance and regarded with the utmost jealousy. The clearest evidence is required that there was no fraud, influence or mistake; that the transaction was perfectly understood by the weaker party; and, usually, evidence is required that a third and disinterested person advised such party of all his rights. The presumption is against the propriety of the transaction, and the *onus* of establishing the gift or bargain to have been fair, voluntary and well understood rests upon the claimant, and this is in addition to the evidence to be derived from the execution of the instrument conveying or assigning the property.

A confirmation must be a solemn and deliberate act — not, for instance, fished out from some expressions in a letter. The court will watch it with the utmost strictness and will not allow it to stand but on the very clearest evidence. The *cestui que trust* must be honestly made acquainted with the material circumstances of the case. The confirming party must not be ignorant of the law; that is, he must be aware that the transaction confirmed is of such a character that he could impeach it in a court of equity.

In an action brought by a client against her attorney to compel him to account for money which she had paid to him for the purpose of having it invested in

real estate mortgages, and which had been lost, owing to the fact that the attorney did not exercise reasonable diligence and such care and skill as is ordinarily possessed by persons of common capacity engaged in the same business, the court will not give effect to an instrument executed by the client to the attorney in which she ratified his acts in her behalf and released him from all liability in respect thereto, unless it appears that the client knew and fully understood the entire transaction and the extent of her legal rights in the premises.

O'BRIEN, J., dissented.

APPEAL by the plaintiff, Leila H. B. Kissam, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 3d day of September, 1903, upon the report of a referee.

This action was brought by a client against an attorney to compel him to account to her for money which she had paid to him for the purpose of having him safely invest it in six per cent real estate mortgages in the city of New York. The referee, upon the rendition of the defendant's account, found that there was nothing with which the defendant was chargeable. Upon the trial it was proven that the plaintiff paid over to the defendant various sums of money which he invested for her in different real estate mortgages, all of which the plaintiff claimed had been so carelessly and negligently invested by him, upon whom she relied and whom she trusted implicitly, that he was chargeable to her with the amount which she had lost upon each one. Upon this appeal, however, the plaintiff questions the finding of the referee in but one of these transactions, which was the loan to Emma L. Bartlett and Homer N. Bartlett, and the subsequent transfer of the mortgaged property to the plaintiff and the subsequent exchange of that property for the premises known as No. 304 West One Hundred and Sixteenth street. The plaintiff and defendant were close personal friends, having been acquainted for many years, the defendant having studied law in the office of plaintiff's father. In the fall of 1896 he drew the plaintiff's will, and shortly after that time there commenced a series of conversations between them as to the advisability of her selling some of the securities which had been left to her by her father at the time of his death, which securities were drawing four or five per cent per annum, and investing the proceeds in loans secured by mortgages on real estate at the rate of six per cent. There is no question but

that the defendant strongly advised this, and finally it was done. The plaintiff sold at various times securities to the amount of $30,900, which defendant invested for her in real estate mortgages. In making these investments the plaintiff relied upon the judgment of the defendant. In September the defendant wrote the plaintiff, who was then in New York city, inclosing a few "applications," with the remark that " I have inspected the properties and approve of them as a safe investment for your money, although I shall make an effort to reduce the amount in each case so as to make the margin of equity as large as possible in your favor. As you know, I dislike to loan more than 60% of the value even at the 6% rate which you require." To this the plaintiff replied : " If you think best I shall be glad to put the amount into these mortgages. * * * I rely entirely upon your judgment in the matter." One of the applications above referred to was that of Homer N. Bartlett for a loan of $10,500, to be secured by a first mortgage on the premises known as No. 236 West One Hundred and Thirty-second street in the city of New York, which the application stated was worth between $16,000 and $18,000. On September 28, 1897, the defendant notified the plaintiff that he had agreed to make a loan of $11,000, with the explanation : " I found I could not secure it for $10,500 and I deemed there was no hazard in investing $500 more than I first wrote you that I should in view of the fact that he was likely to get the sum he wanted, $11,000, from some bank or some estate unless I had finally come to his figures." The loan was accordingly made to the Bartletts on or about the 1st day of October, 1897. The reason for raising the amount of the loan $500 was because the Bartletts had not sufficient means to pay the charges and liens which had accrued against their property, and sought a new loan for that purpose. It appeared upon the trial that at the time this loan was made there were already mortgages for $10,000 upon the premises, upon which the interest was overdue and unpaid, and the second of these mortgages was then in process of foreclosure, and taxes and water rents for the previous year were still unpaid. The defendant testified that before making the loan he had received the opinions of two men, one William H. Blackwell, a real estate dealer, who had appraised the property at $16,000, and the other a Mr. A. P. Jersey, who owned the adjoining premises, who valued the house at $15,000. It was

afterwards proven by the plaintiff that Blackwell had died in November, 1895, nearly two years before the alleged appraisal was said to have been made, and Mr. Jersey denied ever having told the defendant that the property was worth $15,000. The plaintiff called two expert witnesses, one of whom testified that the property was worth $11,500 in 1897, and the other $11,750. The defendant offered no evidence in contradiction of this, and it appeared that during the months of May and June, 1900, when he attempted to sell the property, he was unable to obtain even the sum of $11,000. The Bartletts paid only one year's interest on this loan and then defaulted. A few days after such default the defendant called upon Mr. Bartlett, who told him of his inability to pay and that his inability would probably continue. Immediately thereafter the defendant filed a *lis pendens* and commenced the foreclosure of the mortgage in the plaintiff's name, verifying the complaint himself, the plaintiff at that time being in Europe. This foreclosure was not brought to a sale, for on or about May 13, 1899, the Bartletts deeded the premises to the plaintiff upon a written agreement executed by the defendant that the property should be sold and the proceeds in excess of $11,750 should be repaid to the Bartletts. The plaintiff had given the defendant a full power of attorney, investing him with authority to look after her financial affairs upon her departure for Europe in June, 1899, where she remained until April, 1901. He endeavored to sell the premises, but could not get sufficient to repay the amount of the plaintiff's loan, principal and interest. On May 17, 1900, the defendant wrote the plaintiff, saying: "I had an offer of exchange of the 132nd street house which I am going to look up to-day or to-morrow to see if it is worth recommending you to accept." Nothing further was said about such exchange until the 19th day of June, 1900, when the defendant conveyed the premises No. 236 West One Hundred and Thirty-second street to one Eliza Murphy in exchange for the property known as 304 West One Hundred and Sixteenth street, and took a purchase-money mortgage upon the One Hundred and Thirty-second street property of $8,000 at five per cent. News of this transaction he conveyed to the plaintiff in a letter written the same day, in which he described the newly acquired premises as a five-story single apartment house in which there was an equity of from $2,500 to $3,000 above the

FIRST DEPARTMENT, MARCH, 1905. [Vol. 102.

mortgage thereon. This apartment never paid running expenses, and when the plaintiff returned from Europe about April 20, 1901, the amount she had expended thereon in excess of the rents received was $1,145.35. After her return from Europe she called at the defendant's office, and during a long conversation he explained to her about all the various transactions, and defendant testified that she told him she approved of all his transactions and he asked her to give him a written statement to that effect, which she consented to do, whereupon defendant dictated the following statement to his stenographer, which he testified Mrs. Kissam signed in his presence, no other person being present:

"NEW YORK, *May* 2, 1901.

" GRANT SQUIRES :

" I hereby approve and confirm all that you have done for me, Leila H. B. Kissam, or in my name during the last two years, and more particularly all transactions and proceedings taken to foreclose the Bartlett mortgage procuring me title to 236 West 132nd Street, exchanging the same last June for No. 304 West 116th Street, subject to $16,500 mortgage, and also all acts done by you and by Stephen G. Thomas and Francis R. Foraker, to secure and protect my investments made through Frederick C. Dexter. And I agree to save yourself and said Thomas and Foraker harmless of any and all claims, cost or damage growing out of any proceedings connected with any of the several aforesaid matters.

"LEILA H. KISSAM."

The plaintiff testified that she never signed such paper, and that she never told the defendant that she approved of his acts, but she stated that on the 1st day of May, 1901, she was at the defendant's office, and that she knew the date by reason of a check which she gave on the same day; that at that time she had a conversation with the defendant, but that he did not tell her in detail about the property on One Hundred and Sixteenth street, only telling her that it was not paying expenses. Under his advice, she continued to carry the One Hundred and Sixteenth street property until the 19th of December, 1901, when an action having been started to foreclose the mortgage thereon, she conveyed the same, upon the defendant's advice, to the mortgagee for the sum of $145.

The referee found that the income received from No. 304

West One Hundred and Sixteenth street was inadequate to maintain said premises and pay the taxes and interest on the mortgage thereon; that by reason of the exchange of the two properties as aforesaid, the plaintiff suffered damage in the sum of $5,279.49; that the plaintiff did execute the instrument of approval above set forth, and that with full knowledge of the situation from time to time by act, word and writing, other than the said instrument, expressed her satisfaction with and appreciation of the acts and doings of the defendant in regard to the matters and things forming the subject-matter of this action. Upon the facts thus found by him, he decided as matter of law: "That in regard to the exchange of the premises No. 236 West 132nd Street for the premises No. 304 West 116th Street, the latter being subject to a mortgage for sixteen thousand five hundred dollars, the defendant did not exercise a reasonable diligence or such care or skill as is ordinarily possessed by persons of common capacity engaged in the same business. * * * That the plaintiff duly ratified the acts and doings of the defendant in regard to the making of the Bartlett loan" and the subsequent exchange of the said mortgaged premises 236 West One Hundred and Thirty-second street for the premises 304 West One Hundred and Sixteenth street.

*Edmonds Putney,* for the appellant.

*Gerrit Smith,* for the respondent.

HATCH, J.:

The finding that "the defendant did not exercise a reasonable diligence or such care or skill as is ordinarily possessed by persons of common capacity engaged in the same business," required as a legal conclusion that the defendant should be charged with the amount of the loss on the Bartlett loans. The learned referee concluded, however, that the instrument signed by the plaintiff was a ratification of the defendant's acts in connection with this loan, and consequently released him from the effect of his negligence in that transaction. The proof is abundant to show that the plaintiff relied entirely upon the judgment and fidelity of the defendant in intrusting to him her money for purposes of investment. He assumed to know the values of the respective properties in which he invested her

money, and he also knew that she relied thereon. At the time the instrument of ratification was signed, it does not appear that she had full knowledge upon the subject of the Bartlett loan. It is true that the defendant testified that he told her generally concerning the transaction. He does not, however, say that he informed her that he had loaned the money to Bartlett upon insufficient security for its safe protection. In respect to the conversation, his statement is, in general terms, that he explained all of the transactions to her and that she expressed satisfaction therewith. The defendant says: "I then asked her to give me something to show her satisfaction with what I had done during her absence, especially as the holders." At this point he was interrupted by the presentation of a paper and made no further statement concerning it, aside from the fact that he dictated a statement to the stenographer who took it down on the machine. An examination of the paper itself shows that it was something more than a satisfaction and an approval of his transactions, as among its provisions is the following: "And I agree to save yourself and said Thomas and Foraker harmless of any and all claims, cost or damage growing out of any proceedings connected with any of the several aforesaid matters." It is quite evident from the language of this document that the defendant was anxious not only to procure an expression of satisfaction, but the execution of such a paper as would hold him harmless from all his acts.

The rule governing dealings in such relation has been announced in the law in no uncertain terms. Thus it was said in *Nesbit* v. *Lockman* (34 N. Y. 167): "Where persons standing in a confidential relation, make bargains with or receive benefits from the persons for whom they are counsel, attorney, agent or trustee, the transaction is scrutinized with the extremest vigilance and regarded with the utmost jealousy. The clearest evidence is required that there was no fraud, influence or mistake; that the transaction was perfectly understood by the weaker party; and, usually, evidence is required that a third and disinterested person advised such party of all his rights. The presumption is against the propriety of the transaction, and the *onus* of establishing the gift or bargain to have been fair, voluntary and well understood, rests upon the party claiming, and this, in addition to the evidence to be derived from the execution of the

instrument conveying or assigning the property." This case was approved and the same rule reiterated in *Barnard* v. *Gantz* (140 N. Y. 249). In *New York Life Ins. & Trust Co.* v. *Kane* (17 App. Div. 542) this court said : " The principles applicable to ratification and acquiescence are well stated in *Adair* v. *Brimmer* (74 N. Y. 539). And in *Cumberland Coal & Iron Co.* v. *Sherman* (30 Barb. 575) it is said : ' * * * The confirmation must be a solemn and deliberate act — not, for instance, fished out from some expressions in a letter' —+ that the court will watch it with the utmost strictness and will not allow it to stand but on the very clearest evidence ; that the *cestui que trust* must be honestly made acquainted with the material circumstances of the case — ' The confirming party must not be ignorant of the law ; that is, he must be aware that the transaction is of such a character that he could impeach it in a court of equity.' " A similar rule is announced in *Whitney* v. *Martine* (88 N. Y. 535).

Applying these rules to this case and considering the finding of the referee in connection with the evidence in the case, we are of opinion that this transaction did not operate as a ratification of the defendant's acts and as a release from his liability to her for his negligent acts. It must be made to appear that she knew and fully understood the entire transaction, and what her legal rights were in the premises, before force will be given to the ratification and release.

These views lead us to the conclusion that the judgment should be reversed and a new trial ordered before another referee, with costs to the appellant to abide the event.

VAN BRUNT, P. J., INGRAHAM and LAUGHLIN, JJ., concurred ; O'BRIEN, J., dissented.

Judgment reversed, new trial ordered before another referee, costs to appellant to abide event.